# ROBERT P. MACCHIA & ASSOCIATES
## ATTORNEYS AT LAW

TELEPHONE (516) 873-6200
*FACSIMILE (516) 873-1611

U.S Magistrate Judge Arlene R. Lindsay
814 Federal Plaza
Central Islip, NY 11722-4451

    Re:    *Allstate Insurance Company, et al. v. Elzanaty, et al.*, CV 11-03862 (ADS) (ARL)

    This office represents Plaintiffs in this matter and files this opposition to Jadwiga Pawlowski's ("Dr. P") motion to quash a subpoena served on Charles, Boudin & Company, LLP (the "Accountants") dated July 16, 2012 seeking tax returns and related documents prepared in connection with Dr. P (*see*, Docket No. 143, Exhibit "A"). The assertion that "Plaintiffs are not entitled to the personal tax returns of Dr. P or any documents or correspondence <u>unrelated</u> to income and/or funds she received from her four PCs...or any other defendant in this action" contravenes FRCP 26(b)(1) which sets the standard for discovery in a federal lawsuit. The question is one of relevance and even relevant material need not be admissible at trial so long as it is reasonably calculated to lead to the discovery of admissible evidence. In denying a RICO defendant's motion to quash subpoenas for personal financial records, Magistrate Katz found that although the defendant "...ha[d] a privacy interest in her personal financial affairs; yet, even the confidentiality of personal financial matters must yield to the Federal Rules of Civil Procedure, which govern the discovery of information relevant to the claims and defenses in a federal court action." *Conopco, Inc. v. Wein*, 2007 WL 2119507 at 2. The test for compelling production of tax returns contains two prongs: (1) the relevance of said returns to the subject matter of the action, and (2) a compelling need to produce the records as they are not "otherwise readily obtainable."[1] *See, Smith v. Bader*, 83 F.R.D. 437 (S.D.N.Y. 1969)

    The Complaint alleges that Dr. P participated in a fraud enterprise involving her medical professional corporations (the "Pawlowski PCs"), medical facilities operated pursuant to Article 28 of the NYS Public Health Law (the "Article 28s"), and the three individual defendants to commit multiple acts of Federal RICO mail fraud and money laundering, as well as violations of New York's common law and statutes (*see*, Docket No. 1, Counts I-IV, VI-VII, IX-XIV). The Complaint alleges, among other things, that (1) "[t]he bills generated by the Pawlowski PCs were paid by Plaintiff and initially deposited into the bank account of these seemingly legitimate medical professional corporations" but "[a]fter this initial deposit...the lion's share of the revenues were siphoned to a management company owned and controlled by Elzanaty" (*id.* at ¶2), (2) Elzanaty appointed Pawlowski as a figurehead medical director for his Article 28s when, in reality, she had no active role (*id.* at ¶20), and (3) Elzanaty utilized his corporation "...as a base of operations from where Elzanaty sent his employees to medical clinics throughout New York, which were paid illegal kickbacks in exchange for providing patients to treat at the Article 28s" (*id.* at ¶70(iii)). Plaintiffs' retained accountant expert determined that between January,

---

[1] The case law and the two-prong test Mr. Henry points to pertains to instances wherein a party sought to compel tax returns from an adversary whereas in the instant matter, Plaintiffs have subpoenaed documents from a non-party.

2004 and August, 2010, of the $1,835,881.62 that was withdrawn in the form of checks and/or wire transfers from a JP Medical, P.C. account (*see*, Docket No. 8 at Exhibit I), only $16,000 (*id.* at Exhibit X) was paid to Dr. P whereas approximately $875,000 was paid or transferred to accounts under Elzanaty's control (*id.* at Exhibit VII). In connection with another JP Medical, P.C. account, between January, 2005 and February, 2006, only $42,324.47 (*id.* at Exhibit X) of the $1,476,464.00 in disbursements went to Dr. P (*id.* at Exhibit I). Additionally, of the $6,968,860.93 in check withdrawals and/or wire transfers from an Accurate Medical, P.C account, Dr. P only received $75,587 while $4,014,100 went to an Elzanaty-owned management company (*id.* at Exhibit I and ¶¶20 and 25). Furthermore, of the $2,005,847 in check withdrawals and/or wire transfers from a Quality Medical Healthcare Provider, P.C. account, Dr. P only received $154,958 while accounts controlled by Uptown, Elzanaty and/or Alan Goldenberg received $271,500. (*id.* at ¶¶19, 24, and 29).

Tax returns have been deemed relevant to the subject matter when they are "...reasonably expected to contain information concerning *sources* and *amounts* of income and related financial information." *Libaire v. Kaplan*, 760 F. Supp.2d 288 at 295 (emphasis added). In a case involving many of the same parties named as defendants here, Magistrate Go denied defendants' motion to quash fourteen subpoenas relating to the defendants' personal financial records because she found that the "...scope of the subpoenas [wa]s appropriate for *ascertaining the financial relationship of the moving defendants and non-parties.*" *State Farm Mut. Auto. Ins. Co. v. Accurate Medical, P.C.*, 2007 WL 2993840 (emphasis added). In another RICO action involving allegations similar to the instant matter, District Court Judge Glasser affirmed that turning over documents and financial records which included tax returns was appropriate as such returns would be "...relevant to establishing that defendants profited from their willingness to order CPT tests." *State Farm Mut. Auto. Ins. Co. v. CPT Medical Services, P.C.*, 375 F. Supp.2d 141 at 156.

A large aspect of Plaintiffs' allegations against Dr. P concerns fraudulently obtained money that is then secreted in order to remain undetected and/or untraceable. The pertinent part of the federal money laundering statute reads as follows:

> **18 U.S.C. §1956. Laundering of monetary instruments.**
> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts such a financial transaction which in fact involves the proceeds of specified unlawful activity —
> (A)(i) with the intent to promote the carrying on of specified unlawful activity...
> \*   \*   \*
> (B) knowing that the transaction is designed in whole or in part--
> (i) to *conceal* or *disguise* the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

Therefore, much of Plaintiffs' case rests in the trail of money which began when Plaintiffs issued a check to one of the Pawlowski PCs. Dr. P's tax returns where she reported her earnings from the fraud contain direct admissions of her income and shows receipt of the illegal funds from the trail. The returns also evidence the relationship between her and her co-conspirators and illustrate that she profited from the RICO enterprise. In *Universal Acupuncture Pain Servs, P.C.,*

2

*v. State Farm Mut. Auto. Ins. Co.*, a case involving allegations of a layperson secretly controlling/owning a medical professional corporation by using a management company, District Court Judge Sheindlin affirmed the determination compelling defendants to turn over their tax returns. 2002 WL 31309232. Plaintiffs also allege that Elzanaty paid kickbacks, in some instances through Pawlowksi or her PCs, to entities for patient referrals to the Article 28s; tracing the kickbacks leads to the money trail which leads to Dr. P's tax returns. Furthermore, Plaintiffs have discovered significant charitable donations to a non-profit organization which Plaintiffs believe acted as a vessel to pay other participants in the fraud ring. Therefore, information about Dr. P's charitable contributions is relevant and can only be unveiled in her tax returns.

Although Dr. P did provide Plaintiffs with some of the W-2s from Uptown and the Pawlowski PCs, she omitted some years worth of W-2s (*see*, Docket No. 139[2]). Furthermore, the W-2s she did provide are from entities she owned and Elzanaty controlled. It is unlikely that, if these two individuals were involved in a fraud conspiracy, the data provided in the W-2s is necessarily reliable; Plaintiffs should not be restricted by documents created in furtherance of a fraud enterprise in proving its case. Rather, Plaintiffs should have access to documents such as Dr. P's tax returns that were not generated to perpetrate the fraud itself yet likely contain evidence of the fraud. As indicated in Plaintiffs' motion to compel (*id.*[3]), in response to interrogatories posed to her regarding her income for each Pawlowski PC and Uptown, she failed to provide complete responses. Critically, in response to Plaintiffs' demand for Dr. P's tax returns, Mr. Henry objected that they were not relevant and that ***Plaintiff could obtain the information from other sources*** (*id.* at Exhibit "C"). Now when Plaintiffs attempt to obtain the tax returns from another source, Mr. Henry moves to quash the subpoena for the production of said returns. Moreover, in response to a demand seeking documents used in preparing her tax returns, Mr. Henry stated that he would make the documents available for inspection and copying (*id.*); there is therefore no basis for him to now claim that materials of a similar nature which Plaintiffs are seeking from the Accountants are privileged.

Mr. Henry's attempt to utilize FRCP 45(c)(3)(iv) lacks any basis in law or reality as the subpoena is not asking either himself or his client to appear anywhere or produce anything. Instead, the subpoena is addressed to the Accountants. Regardless, there is no burden to comply with Plaintiffs' subpoena because the subpoena is specific in that it seeks tax returns for a definitive time period and the documents the Accountants utilized in preparing said tax filings. An accounting firm should have no difficulty pulling their client's files. Accounting firms must keep well-organized records for their clients in case of audits or other reasons a client may need access to their tax information such as buying a new home or re-financing a mortgage – regular activities that occur every day in society.

For the foregoing reasons, Mr. Henry's motion to quash should be denied in its entirety.

Respectfully submitted,
/s/ Mehmet F. Gokce
Mehmet F. Gokce (MG0710)

---

[2] Per your Honor's Order dated August 2, 2012 (*see*, Docket No. 146) Plaintiffs will be re-filing the referenced letter, however, without having to re-file and submit all previously submitted discovery materials, Docket 139 is the best available reference point currently filed with ECF regarding Dr. P's previous responses to Plaintiffs' discovery.

[3] See footnote 2.